HARDY, Judge.
This is a suit by plaintiff, widow of John Arthur Brown, individually and for the use and benefit of her minor children, for damages from the death of her said husband resulting from a multi-vehicle accident. Massachusetts Fire & Marine Insurance Company is a co-plaintiff in this action, seeking recovery of property damages sustained by its assured-assignors. The defendants are Hollis Benjamin, driver, Martin J. Moore, owner, and Canal Insurance Company, liability insurer, of one of the truck-trailer units involved in the accident. The named defendants appeal from a judgment in favor of plaintiffs. Written reasons for judgment were not given by the trial judge.
The series of collisions out of which arose this and a companion suit, occurred on U. S. Highway 80 shortly after 4:00 o’clock, A.M., on December 16, 1957, at a point in close proximity to the intersection of a gravel road, which location is known as Bennett’s Crossing, some 3.1 miles west of Rayville in Richland Parish, and approximately two miles west of the Village of Girard. The highway in the neighborhood of the point of collision is straight and level for several miles in each direction and at the time of the accident the surface of the highway was dry and conditions of visibility were unimpaired.
The undisputed facts related to the occurrence of the collisions are that a large truck trailer, driven by the decedent, owned by the A. & B. Truck Lines and insured against collision damage by plaintiff, Massachusetts Fire & Marine Insurance Company, and hereinafter referred to as the Brown truck or trailer, moving east on the highway, collided with the trailer portion of another truck-trailer unit driven by Benjamin, hereinafter referred to as the Benjamin truck or trailer; short minutes after this collision a Jeep motor vehicle, driven by William L. Vanderford, plaintiff in the companion suit to which reference is above made, moving east, crashed into the left side of the Brown trailer in the south lane of the highway, and again, after passage of a very brief period of time, a truck-trailer unit driven by Jack Hoover, owned by the Mercury Truck Lines and insured against collision and liability by plaintiff, Massachusetts Fire & Marine Insurance Company, also collided with the left side of the Brown trailer. At the time of the accident the Brown trailer was loaded with a large truck owned by Mercury Truck Lines, hereinafter referred to' as the “piggyback” truck; the Hoover trailer was loaded with another trailer unit also belonging to Mercury Truck Lines, and the Benjamin trailer did not carry any load.
The basis of the claims of plaintiffs in this and the Vanderford suit is predicated upon the contention that the original collision between the Brown truck and the Benjamin trailer was due solely and exclusively to the negligence of Benjamin, who had jack-knifed or angled the trailer portion of his unit in such manner that it extended across the south lane of travel of the highway, thus blocking the passage of the Brown unit in its eastbound course along said lane.
As the result of the collision between the Brown and Benjamin vehicles the “piggy-back” tractor broke loose from its fastenings and rolled down upon the cab of the Brown truck. The driver, caught between the frontal impact of the collision itself and the crushing blow of the “piggyback” tractor on the rear of his cab, was instantly killed.
After careful consideration of the record, we are of the opinion that the proper determination of this appeal must rest upon the resolution of a single factual issue, which is the location of the impact with reference to the east and westbound lanes of travel of the highway.
Plaintiffs and defendants have evolved, and insistently urge, two violently opposed *327 and completely irreconcilable theories as to the manner in which the original collision occurred. Plaintiffs insist that Benjamin, who was en route from New Orleans to Warren, Arkansas, for the purpose of picking up a load of lumber, had missed his turn-off at the village of Girard, which would have taken him by the shortest and most direct route to Mer Rouge and thence to Warren; that upon discovering this error in his driving, Benjamin was engaged in attempting to back his truck trailer unit into the south gravel road intersection at Bennett’s Crossing with the intention of reversing his direction and retracing his route to the turn-off at Gir-ard; and that while so engaged, and with his trailer angled across the south lane of Highway 80, the Brown truck collided with a full frontal impact against the left side of the Benjamin trailer at a point some sixteen feet toward the rear thereof. This theory rests upon the opinion explanation of the investigating State Troopers, whose testimony will be subsequently discussed in some detail in this opinion. With equal insistence defendants contend that at the time of the collision the Benjamin truck was moving west in its proper lane of travel at a speed of approximately forty-five miles per hour and was struck or sideswiped by the Brown truck, whose driver turned his vehicle across the center line of the highway and rammed the left side of the Benjamin trailer. In support of this theory defendants rely upon the testimony of Benjamin and the testimony of the witness, Ralph H. Snider, who is denominated as an expert safety engineer and accident analyst.
At the very outset of the development of our factual findings we wish to make the specific and definite observation that theories and speculations as to the explanation of why the Benjamin trailer was in the right, or wrong, lane of the highway are unimportant and irrelevant. The ultimate issue, as above observed, must be the determination of the location, with reference to the highway lanes of travel, of the Benjamin trailer and the Brown truck at the moment of impact, which determination must be adjudged upon the basis of the weight of evidence reflected by the record.
Some thirty minutes, more or less, after the first collision, Louisiana State Trooper W. H. Thomason arrived at the scene of the accident and made a thorough investigation of the surrounding physical circumstances and conditions. Shortly after the arrival of Trooper Thomason, he was joined by Sgt. Floyd Edwards and Trooper Stroud, who- participated, to some extent, in the investigation being made by Thom-ason. Both Trooper Thomason and Sgt. Edwards testified at length on trial of the case. Trooper Stroud had moved from the State some time after the accident and was not tendered as a witness.
Trooper Thomason had been employed with the Louisiana State Police for a period of almost eight years, and Sgt. Edwards had been so employed for a period of almost nineteen years. Both of these witnesses were skilled, by practical experience in on-the-spot investigations of many hundreds of automobile accidents, and, as the result of such experience, we believe they were qualified not only to testify as to their specific factual -findings, but, further, to express expert opinions and conclusions drawn therefrom.
Without the need for excessively detailed recapitulation of the testimony of these witnesses, we are of the opinion that their factual findings amply support and justify their conclusions that the impact of the collision between the Benjamin trailer and the Brown truck occurred entirely within the south lane of Highway 80, which was the proper lane of travel for the eastbound unit being driven by Brown. We are of the further opinion that at the time of such impact the Benjamin trailer extended at an angle across the south lane of the highway, blocking the free passage of eastbound traffic therein. These conclusions of the investigating troopers were predicated upon the location of tire and skid marks identified with the vehicles in *328 volved; the position of the debris, nuts, bolts, oil and water deposits and slicks, gouges in the surface of the highway, etc. We think the testimony as to the skid marks of the Brown truck in the south lane of the highway, measuring sixty-two feet from the point of beginning to the point of impact, is particularly relevant and convincing. On the basis of the factual circumstances developed by his investigation, Trooper Thomason placed the point of impact between the Brown truck and the Benjamin trailer as being in the south lane of the highway, six feet nine inches from the south side thereof.
The factual findings and conclusions of Trooper Thomason were largely corroborated by the testimony of Sgt. Edwards and that of the witness, John C. Huffman, who was an extra driver in the Hoover truck and who assisted the officers in connection with their investigations.
The conclusion of the above named witnesses as to the point of impact was further strengthened by their examination of the points of contact and the nature of the damage suffered by the Brown tractor and the Benjamin trailer. The former vehicle sustained severe crushing damage to the front end, particularly at and about the left side of the front bumper, grill, headlight and fender assembly. The damage to the metal frame of the Benjamin truck was located in the left rear area and consisted of a single, continuous, extensive denting of the frame.
The force of the impact was such that the Benjamin trailer was broken loose from the truck and carried a distance of more than sixty feet down the highway to the east before coming to rest on the left side; the truck or tractor portion of the unit, meanwhile, having continued a distance of some seventy-five feet westbound along the north lane of the highway, where it was brought to a stop, by the application of emergency brakes, with its right wheels upon the shoulder of the road. The Brown truck and trailer continued in a northeasterly direction down and across the highway and came to rest at a point some seventy feet more or less beyond the Benjamin trailer.
From the nature, location and degree of damage to the two vehicles, the witnesses above named were positive in the conclusion that the collision could not possibly have occurred by reason of a sideswiping blow and could only have resulted from an almost direct frontal contact by the Brown truck, more pronounced on the left front section, at an angle with the left rear side of the Benjamin trailer.
Impressive corroboration of this evaluation, made upon the basis of the impact between the two vehicles, was given by still another witness, Leroy Jordan, a vehicle body and metal repairman of more than fourteen years specialized experience, who went to the scene of the accident some two • hours after its occurrence and helped remove the Brown truck and trailer. Upon the basis of his careful examination of the wrecked vehicles, it was the positive testimony of this witness that the collision could not have been caused by a sideswiping action but resulted from a direct frontal contact of the Brown truck with the left side of the Benjamin trailer, which, in the opinion of the witness, was stopped “dead still” at an angle of twenty-five to thirty-five degrees across the south lane of the highway.
Still another factual circumstance was given considerable weight by the testimony of the witnesses Thomason and Edwards, namely, their discovery of a board some three feet in length and varying in width, downward, from a maximum of approximately seven inches. This board was found by the troopers at a point slightly south of Highway 80 in the intersection of the gravel road leading into the highway from the south at Bennett’s Crossing. The troopers testified that the board showed such a clear imprint of the left rear dual tires of the Benjamin trailer that a plaster cast could have been made therefrom. The *329 troopers made an immediate comparison between the imprint on the board and the corresponding tires of the Benjamin trailer and testified, with absolute certainty, that the tread print on the board exactly matched the tread of the trailer tires. This testimony was sharply contradicted by the testimony of Mr. Moore, the owner of the Benjamin truck-trailer unit, who testified that the left rear dual tires of his trailer were worn smooth and showed no tread whatsoever. This testimony was corroborated by that of the expert witness, Snider, whose opinion on this point was based upon his examination of photographs of the tires.
We cannot conceive of any possible motive for gross falsification of the testimony of the troopers, but even if this particular detail of evidence supporting their conclusions be completely rejected, we think it has no effect upon the validity of their expressed opinions.
As opposed to the testimony of plaintiff’s witnesses, as above considered, the record contains the testimony of the driver, Hollis Benjamin. Unquestionably it is from the testimony of this witness that the theory of the sideswiping nature of the collision was developed on behalf of defendants. Benjamin testified that he was driving at a speed of forty to forty-five miles per hour, entirely within the westbound lane of the highway; that when he was within twenty or twenty-five feet (“it might have been further or closer”) of the Brown truck—
“I could see this truck, it looked like coming right into me, and when it did, I cut my wheels to the right, and when I did that, he hit me on the side.”
The above quoted testimony is utterly unbelievable for reasons which are so obvious that they really should not necessitate enumeration. Assuming the combined speeds of the approaching vehicle to have been ninety miles per hour and the operating distance to have been, not twenty or twenty-five feet but even fifty to seventy-five feet at the time Benjamin observed the Brown truck turning into him, the elapsed time would in the neighborhood of one-half second, which, by any standard, would not have permitted even an instantaneous reaction on the part of the driver, Benjamin. Nor do we believe that such an abrupt swerving movement could have been accomplished at the speed fixed without pulling the vehicle completely off of the highway, particularly when such a movement would be aided by the force of the alleged sideswiping impact. We have no hesitancy in completely disregarding this testimony and any weight which might be accorded thereto.
We next proceed to a consideration of the testimony of Ralph H. Snider, who was tendered as an expert witness on behalf of defendants. We think it necessary, because of the conflict between the testimony and conclusions of this witness and those whose testimony has been above considered, to give some particular attention to Mr. Snider’s qualifications. By way of preface, it is appropriate to observe that there is a growing tendency on the part of counsel in automobile accident cases to refer to- the' “laws of physics”. Dependent upon their contentions and the points which they desire to impress upon the courts, lawyers are increasingly inclined to argue that a particular factual conclusion is either supported or destroyed by the “laws of physics.” Seldom, if ever, do counsel, no matter how learned, reduce to detailed specifications the particular laws upon which they assert reliance. While it is true that most of us, some slight knowledge as to the general both members of the Bench and Bar, have' operation of physical laws, the conclusion is nonetheless inescapable that few, if any of us, are sufficiently qualified by education, training and experience to make application of any degree of scientific knowledge in this field. As a result, this being the age of specialization, experts denominated as “Accident Analysts” are more and more being used as witnesses for the purpose of expressing opinions both as to cause and effect of vehicular collisions.
*330 This development is not unlike that which has become thoroughly familiar to our courts in connection with the testimony of expert medical witnesses. With respect to the weight accorded the opinions of such experts, there have evolved certain rather well-defined and generally accepted standards of bases of evaluation, among which we find, by way of example, pronouncements that the testimony of specialists in their respective fields is accorded greater weight-than is given to the testimony of doctors of medicine who have not specialized in such fields; that the education, training and experience of a particular expert are material factors to be considered with respect to his testimony, etc., etc.
We must assume that the same standards and requirements will be applied to those witnesses who are qualified as experts in the field of physical science, and, upon the basis of this assumption, we move to a consideration of the qualifications of the witness in question.
Mr. Snider testified that he “attended Wichita University, and after getting out of there” worked in two air craft factories in Oklahoma in the capacity of Safety Director; was a photographer for the Wichita Kansas “Beacon”; served as State Safety Consultant for the Federal Works Administration as Safety Director; in the same capacity for the government at air bases in three states; for the City Bus Company of Oklahoma City, and then went into business for himself, conducting a driver testing and training service. In connection with this last occupation, Mr. Snider testified that he established a laboratory in which he administered psychological and “psychophysical” tests for the purpose of qualifying commercial vehicle drivers; that he has another business known as the Safety Service Company, devoted to the sale and distribution of a device known as an “Accident Analysis Calculator”, and that he has a third business known as the “Accident Analysis Laboratory.” It is in connection with the operation of the Accident Analyst Laboratory that the witness undertakes to reconstruct traffic accidents and determine their causes and results.
In the examination of this witness for the purpose of establishing his qualifications as an expert, counsel for defendants called attention to his testimony in Missouri-Kansas-Texas Railway Co. v. Hamilton (Texas Court of Civil Appeals) reported in 314 S.W.2d 114, in which the court accepted and relied to some extent upon Mr. Snider’s testimony on behalf of the original plaintiffs.
Upon the basis of the witness’ long years of experience we would not for a moment dispute his right, from a standpoint of practical information, to qualify as an “expert”. However, we are not convinced, from the nature of his qualifications as reflected by the record, that the degree and nature of his expert knowledge extends beyond that of other individuals whose efforts are devoted, in the -course of their occupation, to the investigation, of automobile accidents and the formulation of conclusions resulting therefrom. In other words, we think the status of Mr. Snider as an expert witness can be considered as neither greater nor less than that of the State Troopers who testified in this case. In this connection it is pertinent to observe thtft Mr. Snider’s examination was made upon the basis of eighty-nine photographic exhibits related to the scene of the accident and the vehicles involved, all of which were introduced as evidentiary exhibits in the record under examination. Additionally, Mr. Snider made an examination on the ground at the site of the accident some two years after its occurrence. We have not reached the point where, under such circumstances, we feel it is incumbent upon us to regard opinion evidence based upon photographic exhibits as carrying the same persuasive degree of weight as is accorded to a thorough and painstaking on-the-spot investigation made by trained and experienced individuals immediately following the occurrence of the accident. We make the above observation despite Mr. Snider’s *331 testimony that he has found the opinions of investigating- police officers to he in error in about sixty per cent of the cases which he has examined. We can only conclude that this estimate is based upon the ultimate fact that the opinions of the officers in such cases have been considered in error only because they differed with the opinion of Mr. Snider.
There is one further pertinent observation which we feel compelled to set forth in this opinion. Mr. Snider, on cross examination, testified that a collision of two vehicles traveling in opposite directions at speeds of fifty miles per hour each, that is, a combined speed of one hundred miles per hour, would effect no greater damage than might be expected from a collision of one vehicle, traveling at fifty miles per hour, with a solid wall. With reference to this pronouncement the witness referred, without particularization, to the force based upon kinetic energy contained within each vehicle. Even upon the basis of our conceded limitations in the field of physical science, we think the conclusion of the witness as to the illustration given is completely erroneous. Kinetics is that branch of dynamics which treats of changes of motion produced by force, and actual or kinetic energy due to motion is susceptible of development by an accurate formula, namely, that energy is equal to the product of one-half of the mass involved and the square of the velocity. The formula is customarily written:

To contend that both combined masses and combined speeds (the latter being elements of velocities) are irrelevant in consideration with the cause and effect of automobile collisions, appears to us to be erroneous almost to the point of absurdity.
Finally, it must be pointed out that Mr. Snider did not testify as to the length of his attendance at Wichita University, nor the studies in which he specialized, which could have been either Physical Science or Physical Education, and for this and the reasons otherwise developed above, the record does not justify the acceptance of Mr. Snider as an expert in the field of the Science of Physics, nor of his opinions as. deserving of greater consideration than those of the witnesses on behalf of plaintiffs. . t
While we regret the exhaustive detail in connection with the above discussion, we feel it necessary for the purpose of clarifying the position of this court with regard to the weight which should be accorded the testimony under examination, and possibly as a guide and standard for members of both Bench and Bar with respect to the use of such testimony in connection with cases which may develop in the future. Finally, it is only fair to note that we have intended not the slightest reflection upon the ability and qualifications of the particular witness, for our discussion has been based upon and confined to the qualifications reflected by the particular record before us.
Careful examination of Mr. Snider’s exhaustively detailed testimony has completely failed to convince us that it suffices to controvert the conclusions of plaintiff’s witnesses as to the location and point of impact of the vehicles involved. Obviously this same conclusion must have been reached by the trial judge, and it follows that we find in his resolution no manifest error.
Finally, it is urged on behalf of defendants that the collision between the Brown and Benjamin vehicles was attributable to the excessive speed of the Brown unit, which is contended to have been traveling substantially in excess of the forty-five miles per hour maximum legal limit for trucks, and that such speed constituted negligence which was a proximate or contributing cause of the accident.
The only testimony in the record bearing directly upon the rate of speed of the Brown unit was given by Trooper Thom- *332 ason, who estimated the speed at the time of the collision to have been approximately sixty miles per hour. The trooper conceded that he was influenced in his estimate of speed by information obtained from William L. Vanderford, plaintiff in the companion suit, to the effect that the Brown truck and trailer had passed him several miles from the scene of the accident, at which time Vanderford’s speed was between fifty-five and sixty miles an hour. The effect of this information is somewhat minimized by Vanderford’s testimony on trial of his suit that he crashed into the wreckage of the Brown trailer almost immediately after the occurrence of the collision, at which time the dust raised by the collision had not settled. However, accepting the Trooper’s estimate, we can find no causal connection between Brown’s excessive speed and the occurrence of the collision. In our opinion the negligence of Benjamin in permitting his trailer to extend into or across the south lane of the highway was the sole proximate cause of the collision.
On the issue of contributory negligence, while, concededly, it is the general rule that the driver of a motor vehicle must proceed at a speed which will permit him to stop within the range of his headlights, this rule is subject to the well recognized exception established in scores of cases by every appellate tribunal of our State, to the effect that the motorist is not required to anticipate an unexpected and unusual obstruction of the highway in his proper lane of travel. One of the factors which is taken into consideration in the application of this exception to the general rule is the type of construction of the vehicle or other obstacle. In the instant case a motorist driving east would have been confronted only with the side of the unloaded Benjamin trailer, which would have presented only a somewhat skeletal appearance without that nature of solid bulk which would have been indicated by the ordinary and expected type of vehicle occupying the hig'hway. Under the factual circumstances prevailing in this case, we think it clearly comes within the exception noted under the long line of authority, beginning with Gaiennie v. Cooperative Produce Company, Inc., 196 La. 417, 199 So. 377.
Nor is there any proof in the record which would justify the conclusion that the collision would not have occurred if Brown had been driving within the maximum rate of speed. A conclusion to such effect would rest upon sheer speculation.
It must be pointed out that although the plaintiff widow prayed for judgment in excess of $150,000, a voluntary remittitur was entered reducing the amount of damages sought to the principal sum of $5,000, which was the maximum limit of personal injury liability for one person under the policy of defendant, Canal Insurance Company. Similarly, although plaintiff, Massachusetts Fire & Marine Insurance Company, prayed for and was actually awarded, in the judgment rendered, the sum of $8,860.80, it was necessary for the district judge to apportion this amount with reference to the award for property damages made in favor of Vanderford, plaintiff in the companion suit, again in consideration of the property damage limitation of $5,000, representing the maximum liability of the Canal Insurance Company.
The effect of the policy limitations resulted in rendition of actual monetary judgments in favor of the plaintiff, Mrs. Phyllis E. Brown, in the principal sum of $5,000, and in favor of plaintiff, Massachusetts Fire & Marine Insurance Company in the principal sum of $4,307.31.
Under our appreciation of the facts, we find no manifest error in the judgment appealed from, and, accordingly, it is affirmed at appellant’s cost.