HOOD, Judge ad hoc.
This is an action for damages instituted by Amos R. Charles, Joyce Barnes Charles and Darrell Charles, the father, mother *49 and brother, respectively, of Renaldo Charles, deceased, against Southern Farm Bureau Casualty Insurance Company, arising out of a motor vehicle collision in which three automobiles were involved. One of these cars was a 1950 model Ford, owned by plaintiff Darrell Charles and being driven by his brother, Renaldo Charles, now deceased. Another car involved in this collision was a 1956 model Oldsmobile, owned and being driven by Finnon T. Allen, now deceased. The third vehicle so involved was a 1957 model Buick, which was owned and was being driven by Flenry L. Griffin, also deceased. The drivers of all three of these vehicles were killed almost instantly as a result of this collision.
Amos R. Charles and Joyce Barnes Charles demand damages alleged to have been sustained by them as the result of the death of their son. Darrell Charles, alleging that he was the owner of the automobile being driven by his deceased brother, demands judgment for the cost of repairs to that car.
At the time of the collision there was in effect a public liability insurance policy issued by defendant covering the Buick automobile which was owned and was being driven by decedent, Henry L. Griffin. This policy provided limits of liability of $5,000 for injuries sustained by. one person, $10,000 for injuries sustained by all persons as a result of one accident, and $5,000 for property damage.
Shortly after this suit was filed two other actions for damages arising out of the same accident were instituted against this defendant. One of these suits was filed by Insurance Company of St. Louis, the collision insurer of the Allen Oldsmobile, in which a demand was made as subrogee of the estate of Finnon T. Allen, deceased, for damages resulting from the alleged destruction of that car. The other suit was filed by the father and mother of Finnon T. Allen, in which they demand damages alleged to have been sustained by them because of their son’s death. All three of these suits were consolidated for trial. After trial of these consolidated cases, the district court rendered a separate judgment in each suit in favor of defendant, rejecting the demands of all plaintiffs and dismissing each of said suits at plaintiffs’ costs. From this judgment the plaintiffs in each of said suits have appealed.
The evidence establishes that a collision involving these three automobiles occurred about 1:30 A.M. on March 24, 1957, on Louisiana Highway 14, about 8 miles west of the City of New Iberia, in Iberia Parish, Louisiana. The highway at that point is a heavily traveled concrete thoroughfare, running generally east and west, the hard surfaced portion of the highway being 18 feet in width, with relatively wide shoulders on each side. The shoulders were smooth and were in good condition. There was a gradual or shallow curve in the highway at the point where the collision occurred, the curve being to the right or to the south as a vehicle traveling in an easterly direction approached the site of the accident from the west. At the time of the accident the weather was cloudy but the highway was dry. There was no light in that area except that produced by automobile headlights.
At or just prior to the time of the accident the occupants of the Ford automobile were the driver and one passenger, a twenty year old colored youth named Lionel Wilturner, Jr. The only occupants of the Oldsmobile and Buick automobiles were the drivers. As has already been stated, all three drivers were killed instantly as a result of the accident. Wilturner, the passenger in the Ford, however, received only minor injuries.
An hour or more before the accident occurred Renaldo Charles and Lionel Wilturner, Jr., left Abbeville in the Ford automobile and traveled in an easterly direction along this highway en route to New Iberia. When they arrived at the site of the accident Charles parked the car on the south *50 side of the highway facing east in order that he could investigate and determine whether he had a flat tire. The lights of the car were turned off, and the occupants allowed the Ford to remain parked in that position for about thirty minutes before either of them got out of it. Charles, who was seated behind the steering wheel, then opened the left door of the car, got out, closed the door and walked toward the back ofl the car. As Charles got out of the Ford, the Oldsmobile being driven by Allen in an easterly direction approached the Ford from its rear. About the time or shortly after Charles reached the back end of the Ford he was struck by the Oldsmobile, and his body was knocked across the shoulder of the highway to a point about 16 feet south of the edge of the concrete slab. Immediately after the Oldsmobile struck Charles it then collided with the Ford, the right side of the Oldsmobile striking the left rear end of the Ford. As the Oldsmobile was approaching the site of the accident from the west, the Griffin Buick also was approaching it along the same highway from the east. At some point near the place where the Ford was parked the Oldsmobile and the Buick also collided, the left front and side of the Oldsmobile striking the left front and side of the Buick. Both of these cars were badly damaged as a result of this accident, indicating that they collided with considerable force.
After the collisions occurred the Ford and the Oldsmobile came to rest almost side by side, both cars facing in a northeasterly direction, the front wheels of these cars being almost on the north edge of the hard surfaced portion of the highway and the rear end of said vehicles extending into the south lane of traffic. The Buick came to rest at a point approximately 240 feet west of the other two cars, facing in a southeasterly direction, the rear end of the Buick being on the north shoulder of the highway and the front of the car extending into the north lane of traffic.
The only issues presented in this case relate to the facts. Plaintiffs contend that the collision between the Oldsmobile and Buick occurred at a point approximately 100 feet west of the place where the Oldsmobile and Ford finally came to rest, that the point of impact was in the south or eastbound lane of traffic, and that as a result of this collision the driver of the Oldsmobile lost control of his car and thereafter collided with the Ford at a point 60 or 70 feet east of the place where the first collision occurred. They contend that the sole proximate cause of the accident was the negligence of Griffin in driving his Buick at an excessive speed, in failing to maintain a proper lookout, in driving into the south lane of traffic in the path of the on-coming Oldsmobile, and in failing to maintain proper control over his car. Defendants, on the other hand, contend that the point of impact between the Oldsmobile and the Buick was at or within a few feet of the place where the two east-bound cars came to rest, that this collision occurred in the north or west-bound lane of traffic, and that it occurred after or almost simultaneously with the collision between the Oldsmobile and the Ford. Defendants contend that the driver of the Buick was without fault, and in the alternative it specially pleads contributory negligence on the part of the drivers of the other two vehicles.
The record contains the testimony of only two eyewitnesses to the accident. Wil-turner, who was seated in the front seat of the Ford at the time the collisions occurred, testified that the Ford was parked entirely on the south shoulder of the highway with no part of the car on the concrete slab, that shortly after Charles alighted from the Ford, the Buick passed them going in a westerly direction, that a moment after this car passed them Charles cried, “Look,” that the Buick then collided with the Oldsmobile at a point west of the Ford, and thereafter the Oldsmobile collided with the car in which the witness was seated. Ray Bourque testified that shortly before the *51 accident occurred he was driving his car about 60 miles per hour in an easterly direction, approaching the' scene of the accident, that the Allen Oldsmobile overtook and passed him like he “was stopped,” that after the Allen car had passed him he saw the Ford parked on the pavement in the east-bound lane of traffic in front of the Oldsmobile, that he knew that a collision was imminent as the Oldsmobile was going too fast, and that he then heard a crash and there was a blackout, meaning that all of the lights on the cars went out. As he was bringing his car to a stop he testified that he saw the Buick without lights sliding by him on the north shoulder of the highway. Although Bourque did not see the Buick prior to the collision, his testimony indicates that the Oldsmobile did not collide with the Buick before it reached the Ford, as contended by plaintiffs.
The trial judge, after hearing and observing these two witnesses, attached very little weight to the testimony given by Wilturner, and he apparently attached much weight to that given by Bourque. The record does not indicate that he committed any error in doing so. Since these witnesses disagree as to the manner in which the accident occurred, it is necessary to rely heavily upon the physical facts which were established.
The evidence establishes that the driver of the east-bound Oldsmobile applied his brakes hard and skidded the wheels of that car a distance of approximately 165 feet from the point where the brakes were first applied until the car finally came to rest. These skid marks began in the south lane of traffic and continued in an easterly direction, bearing slightly to the south, in straight, parallel, unbroken lines for a distance of 119 feet, at which point the right, or southernmost, mark ran off the south edge of the concrete slab. The left skid mark continued, however, in an unbroken straight line for about 37 more feet, and then that skid mark turned to the north, where it was mingled with other skid marks, and all of these skid marks crossed into the north lane of traffic and came to an end at the place where it was established that the Oldsmobile and Ford came to rest. At and near the place where these two cars came to rest there was a considerable amount of blood, dirt, glass and other debris on the highway, including the mangled left front wheel of the Buick.
A blood stain, which unquestionably came from the body of Charles, was found 16 feet south of the paved portion of the highway, about 37 feet west of the point where the Oldsmobile and Ford came to rest. Wilturner testified that the Ford had been parked even with the “fourth fence post,” running east from a driveway on the south side of the highway, and that Charles’ body was found “right about the third or second fence post,” which indicates that the Ford was parked a few feet east of the point where the body was found. If that was the position of the Ford prior to the accident, it is obvious that the collision between the Oldsmobile and the Ford occurred within a few feet of the place where those cars came to rest.
The evidence also establishes that in this accident the left front wheel of the Buick was sheared completely off, and the wheel was separated from the tire. After the accident the tire was found in the front lawn of a residence located immediately north of the wrecked Oldsmobile and Ford, and, as has been stated, the damaged front wheel of the Buick came to rest immediately in front of the Oldsmobile and Ford.
The evidence further establishes that after the accident there was a mark on the paved portion and on the north shoulder of the highway, which mark obviously had been made by some metal part of the Buick scraping the highway after it had collided with the Oldsmobile. This scraping mark was approximately 228 feet long. It began at a point in the north lane of traffic, about 12 feet west of the place where the Oldsmobile and Ford came to rest and about 6 feet north of the center line of the highway, and from that point it ran in *52 almost a straight line in a westerly direction, bearing slightly to the north, a distance of approximately 108 feet to the north edge of the hard surfaced portion of the highway. From the point where this scraping mark left the paved portion of the highway it continued as a “furrow” or trench, running generally in a westerly direction along the north shoulder, an additional distance of about 120 feet to the point where the damaged Buick came to rest.
The State Trooper who investigated the accident testified that this mark, which he described as a “gouge mark,” was present on the paved portion of the highway after the accident occurred, tie outlined its location on a plat which was filed in evidence, and he identified this mark on some photographs which were introduced. Plaintiffs vigorously contend that no such mark existed, and in support of that argument they point out that the trooper had made no mention of it on his official report of the accident, that a civil engineer who visited the scene two days later and prepared a plat purporting to show all of the markings and debris on the highway relating to the accident did not include any such mark, and that other witnesses who visited the scene had not seen it. The trial judge concluded that such a mark did exist, and that it was made by some metal part of the disabled Buick automobile. We concur with him in that conclusion. Aside from the fact that the State Trooper’s testimony is clear and convincing as to that fact, it appears to us that the heavy flow of traffic over the paved portion of this highway may have obliterated that mark or made it inconspicuous by the time the civil engineer visited the scene. Also, the plat prepared by the engineer clearly shows the “furrow” or trench made by the Buick for a distance of about 120 feet along the north shoulder, running from the north edge of the concrete slab to the place where the Buick came to rest. It seems to us that it would be illogical to assume that the Buick made no mark of any kind as long as it remained on the pavement after the accident, but that immediately upon reaching the edge of the hard surfaced portion this metal part on the car for the first time touched the ground and began to leave a distinct furrow or trench as the car slid to a stop.
We agree with the trial judge in his conclusion that this “gouge mark” in the paved portion of the highway was made by the Buick after it collided with the Oldsmobile, and that at the time the Buick first began to make this mark it was partially on the north shoulder of the highway. This indicates that the collision between the Oldsmobile and the Buick actually occurred at or near the point where the Oldsmobile and Ford came to rest, and that the Buick at that moment was partly on the north shoulder of the highway and partly in the north or its proper lane of traffic.
Plaintiffs, however, also produced the testimony of Mr. Clarence S. Bruce, a physicist and an expert traffic analyst. Mr. Bruce worked in the National Bureau of Standards in the automotive section for thirty-four years, and while so employed he conducted many experiments in the operation and behavior of automobiles under circumstances simulating collisions. From these experiments he formulated certain mathematical equations and accumulated a great deal of data as to the weight, braking distances, center of gravity and other facts relating to all makes of cars. He testified that by using his formulae, the facts he has accumulated, the laws of physics and the known facts of an accident he can scientifically analyze or reconstruct an accident from the physical evidence left after it occurs. Prior to the trial of this case Mr. Bruce examined a number of photographs which were introduced in evidence, a plat of the scene of the accident prepared by a civil engineer from notes taken two days after it occurred, a copy of the police report of the accident, and other documents which he could not recall. He also visited the scene of the accident two *53 «r three days before the trial, being aware at the time this visit was made of the fact that the highway had been re-surfaced and some changes had been made in it since the date of the accident. With the information which he had obtained from these sources, and with some additional facts which he was required to assume in answering hypothetical questions, he expressed the opinion that the collisions occurred substantially in the manner alleged by plaintiffs. He was firmly of the opinion that the Oldsmobile collided with the Griffin Buick at a point in the south lane of traffic, several feet west of the place where the Ford was parked, and that this collision occurred before the Oldsmobile struck the Ford. He further testified that the accident “couldn’t have happened any other way than the way we have got it happening here.”
The trial judge, in his excellent written reasons for judgment, further analyzed the testimony of Mr. Bruce as follows:
“He deduced that the Oldsmobile was traveling 72.8 miles per hour before its brakes were applied, and that the Buick was going 44.6 miles per hour. (See P-42) When they collided he thinks the Oldsmobile was traveling 60.5 miles per hour and the Buick was still going 44.6 miles per hour. After they collided he says the Oldsmobile was slowed down to 51.5 and was still traveling 41 miles per hour when it hit the Ford. The Buick was slowed down to 32.4 miles per hour after its collision with the Oldsmobile.
“In these computations Mr. Bruce relies heavily on skid marks left on the pavement as portrayed on the engineer’s plat. He assumes that they were unbroken as shown on the plats.
“Mr. Bruce likewise assumes that cars involved in a collision behave completely in accordance with the laws of physics as developed under laboratory conditions. This assumption is difficult to follow. For instance, Mr. Bruce made no allowance, and it is difficult to see how he could, for the possibility that the Ford was in gear, or had its emergency brakes on, or did not, or that it was all on the shoulder, or all on the pavement, or only partly so, when it was struck. Any of these circumstances would vary the friction, hence the force required to move the Ford. This is true also of the two other cars. The Oldsmobile had its front left tire blown out, as seen in the photographs. Its fender and the other metal parts near this wheel were demolished. When this happened, no one knows either whether this wheel could turn, and if it could turn, how much effort was required to make it turn. Certainly, with the tire flat it could not run as freely as before. The Buick had its left front wheel completely sheered off. After that happened, it is obvious that more force was required to move the car than before. Yet Mr. Bruce makes no allowance for these factors. Were they known, and could be computed, it is obvious that they would materially affect the values he assumes in his equations, hence his deductions.
“These matters were called to Mr. Bruce’s attention. He simply stated that these variables would not materially change his conclusions.
“Another assumption of Mr. Bruce that is difficult to follow is that the cars involved in this collision moved in the direction of the force that caused them to move. Again he relies on accepted laws of physics. This law is that a body will move in the direction of the force that is applied to make it move. That law is easily demonstrated in the laboratory. Mr. Bruce demonstrated it in Court. He used small flat plastic objects. They slid on the smooth surface of the table in the direction he predicted.
“But with cars on the highway the results are not always as predictable. *54 Cars have wheels and it is only at these wheels that friction with the ground exists. The direction the wheels are turned, and the amount of friction existing at each wheel influence the direction in which the car will travel when struck. The kind of tire, its pressure and the surface on which it travels are all factors that determine friction.
“Then again, its direction of travel depends upon the point of the most friction in relationship to the center of gravity of the car. The center of gravity varies with the load in the car, and the distribution of its components.
“It is not uncommon, and it is a fact with which Courts should be fully cognizant in the hearing of automobile collision cases, that when brakes are applied on a car and the wheels skid, the car soon becomes uncontrollable and no one can predict which way it will go. It is almost always certain to veer one way or the other. Sometimes it will turn completely around and head in the direction from which it was traveling.
“These well known facts render the conclusions of the expert less impressive.”
Although we are impressed by the training and the vast amount of experience which Mr. Bruce has had, we, like the trial court, cannot agree with him in his theory as to how this accident occurred. We disagree, for instance, with his conclusion that the Buick was not involved in a collision of any kind until it reached a point more than 100 feet west of the place where the Oldsmobile and Ford finally came to rest, because in arriving at that conclusion he apparently has not considered and certainly has not explained the fact that some metal part of the Buick began making a long scraping mark or “gouge mark” on the highway 12 feet west of the place where the other two cars finally stopped, which would be 80 or 90 feet before the Buick ever reached his theoretical point of impact. Further, he states that when these two cars collided, “The Buick went to the right, its right and the Oldsmobile went to its right.” Actually, if his theory is correct, the Buick must have been knocked from the south lane of traffic to the north edge of the pavement within a distance of IS or 20 feet from the point of impact, yet the plat shows the skid marks of the Oldsmobile to be perfectly straight and unbroken at the place where he concluded that the collision occurred, with no marks of any kind being made by the Buick. We, like the trial judge, are not impressed with plaintiffs’ arguments to the effect that a “swirl mark” identified by some of the witnesses as being located between the two skid marks of the Oldsmobile was made by the left front wheel of the Buick. The evidence shows that the left front tire of the Oldsmobile was badly damaged and was knocked flat when it collided with the Buick, yet there appears to be no change in the appearance of the skid marks obviously made by the left wheels of the Oldsmobile at the point where plaintiffs contend the collision occurred. There can be no question but that Allen was incapacitated, if not killed, instantly as a result of the collision between the Oldsmobile and the Buick. The evidence shows, however, that he continued to apply the brakes of the Oldsmobile and to skid its wheels for a distance of at least 100 feet after it passed the point where Mr. Bruce finds that the collision occurred. Mr. Bruce also theorized that the right front door of the Oldsmobile first struck the left rear corner of the Ford, and that this impact turned the front of the Oldsmobile counter clockwise, causing the right rear door of the Oldsmobile then to strike the Ford. We are not able to visualize how the right front door of the Oldsmobile, which according to Mr. Bruce was traveling straight ahead, could be the first part of that car. to contact the parked Ford. Also, if the Oldsmobile was knocked “at right angles to the Ford” as a result of this initial impact, it appears *55 to us that the skid mark left by the left tires of the Oldsmobile would not have continued in a straight, unbroken line, as is shown on the plat offered in evidence by plaintiffs. And, finally, there was relatively little, if any, debris found at the place which Mr. Bruce determined was the point of impact, while there was a considerable amount of debris, including a part from the Buick automobile, at the point where defendant contends that the accident occurred.
The evidence convinces us, as it did the trial judge, that the Griffin Buick was partly on the north shoulder and partly in the west-bound lane of traffic at the time it collided with the Oldsmobile, and that the point of impact between those two cars was at or near the place where the Oldsmobile and the Ford finally came to rest. The evidence does not establish that this collision occurred in the south lane of traffic, or at a point several feet west of the place where the Ford was parked, as contended by plaintiffs. It is obvious, of course, that when the Oldsmobile and Ford finally came to rest they were in different positions than they had been when the former collided with the Buick. It is not necessary for us to theorize as to the exact position of the Oldsmobile and Ford at ■the moment of impact, however, because the ■primary issue presented here is whether •the driver or the Buick was negligent in •the operation of his car. We have found •that the collision occurred in Griffin’s proper lane of traffic, and that the Buick did ■not enter the south lane of traffic at any time. The fact that the Buick was partly on the north shoulder of the highway when the collision occurred indicates that the driver of that car was maintaining a proper lookout, that he was maintaining proper control over his car, and that he was endeavoring to avoid the accident. There is nothing in the record to indicate that he was driving at an excessive speed at that time.
The burden of proof, of course, rests upon plaintiffs to establish by a preponderance of the evidence the facts upon which they rely for judgment. In this case the burden of proof rests upon plaintiffs to establish by a preponderance of the evidence that Griffin, the driver of the Buick automobile, was negligent in the operation of his car. We can find no manifest error in the conclusions reached by the trial judge that plaintiffs have failed to sustain this burden of proof.
Since plaintiffs have failed to show negligence on the part of defendant’s insured, it is not necessary to consider the issues of where the Ford was parked at the time of the accident or whether the drivers of the other two vehicles were guilty of contributory negligence.
For the reasons herein assigned the judgment of the district court is affirmed.