133 So.2d 1 (1960)
Douglas P. STEVENS
v.
LIBERTY MUTUAL INSURANCE COMPANY et al.
No. 5133.
Court of Appeal of Louisiana, First Circuit.
December 19, 1960.
On Rehearing June 30, 1961.
Rehearing Denied September 25, 1961.
Certiorari Granted November 6, 1961.
*2 William P. Macmurdo, Percy & Macmurdo, Taylor, Porter, Brooks, Fuller & Phillips, Robt. J. Vandaworker, Chas. W. Franklin of Seale, Hayes, Smith, Keogh & Franklin, Baton Rouge, for appellant.
Maurice J. Wilson, of Breazeale, Sachse & Wilson, Baton Rouge, Robert J. Vandaworker, of Taylor, Porter, Brooks, Fuller & Phillips, Baton Rouge, for appellee.
Before ELLIS, LOTTINGER, JONES, HERGET and LANDRY, JJ.
LOTTINGER, Judge.
This is a suit for damages for personal injuries resulting from an intersectional collision. Petitioner is Douglas P. Stevens who was a guest passenger in a car being driven by defendant, Dominic A. Regan. Regan's vehicle was insured by defendant, Liberty Mutual Insurance Company. Also made defendants were Eugene A. Nolan, who was driving the other vehicle, which other vehicle was insured by defendant, Royal Indemnity Company, and American Automobile Insurance Company, the insurer of the personal automobile of defendant Nolan, which was not involved in the collision. The Lower Court awarded judgment in favor of petitioner and against defendants in the total amount of $27,011.44. All defendants have appealed, and the petitioner has answered the appeal seeking an increase in quantum.
The accident occurred at approximately 11:00 o'clock a.m. on May 28, 1958 at the intersection of Convention Street and North 16th Street in the city of Baton Rouge, Louisiana. The weather was clear and the conditions were dry. Convention Street is a favored thoroughfare running east and west. It is of brick surface and 28 feet in width. North 16th Street runs northerly and southerly, is 22 feet in width and of concrete surface. There is a stop sign situated at the northwest corner of the intersection facing traffic moving south on North 16th Street. The legal speed limit at the place of the accident is 30 miles per hour.
Immediately prior to the accident in question, defendant Dominic A. Regan was driving his 1955 Oldsmobile automobile in a southerly direction on North 16th Street, approaching the intersection with Convention Street. Riding in the automobile with Regan was petitioner, Douglas P. Stevens, who was a guest passenger therein, which fact has not been disputed in this suit. Upon approaching the intersection of Convention Street, Regan stopped in obedience to the stop sign, and testified that he saw the vehicle driven by Nolan approaching easterly on Convention Street at a distance of some 320 feet west of the intersection. At the time he first noticed the Nolan vehicle, it was crossing railroad tracks which are situated approximately 320 feet from the said intersection. Assuming that he had plenty of time to safely cross the intersection, Regan attempted to continue his journey, and was struck before clearing the intersection. The Regan vehicle was insured by Liberty Mutual Insurance Company, *3 the policy limits, for the purposes of the facts presented in this suit, being $25,000.
Prior to the accident defendant, Eugene A. Nolan, was driving a 1956 Oldsmobile which was owned by Mrs. Fred Hannie. The said vehicle had been loaned to him for this day due to certain repairs which were required to his own vehicle. The liability insurer of Mrs. Fred Hannie is Royal Indemnity Company, with limits of $10,000 for the factual situation presented. Defendant Nolan's personal automobile was insured by American Automobile Insurance Company which would be liable secondarily in the sum of $25,000. Nolan testified that he was driving easterly on Convention Street at a speed of approximately 30 miles per hour immediately prior to the accident. He further testified that he had stopped at the railroad tracks because a red light was flashing, however, upon noticing the train stopped near the intersection, he crossed and proceeded on his journey. He testified that immediately upon seeing the Regan car crossing the intersection, he applied his brakes and turned slightly to the left, however, he was unable to avoid the impact.
The factual evidence discloses that the point of impact was 10 feet north of the south line of Convention Street and four feet east of the west line of North 16th Street. The front portion of the vehicle driven by Nolan struck the right rear portion of the Regan vehicle at approximately the right rear wheel. The Nolan vehicle left skid marks of 22 feet prior to the impact. After the impact, the Nolan car skidded, or slid, an additional 22 feet, and came to rest against the southern curb of Convention Street, with its front wheels resting on the curb. It was facing in a southerly direction and was some eight or ten feet east of the eastern boundary of North 16th Street. The Regan vehicle, on the other hand, was turned around in excess of 180 degrees, and came to rest facing in a generally northeasterly direction with approximately half of the car on North 16th Street, and the other half on the curb, at a location of approximately 18 feet south of the southern line of Convention Street. It rested on the western side of North 16th Street. Petitioner filed this suit seeking damages in the amount of $54,381.44 representing physical injuries as well as loss of wages sustained as a result of the accident. The Lower Court awarded judgment in the amount of $27,011.44, noting therein the various policy limits of the defendant insurance companies, and further noting that Royal Indemnity Company's liability is primary to that of American Automobile Insurance Company. All defendants have appealed, and petitioner has answered the appeal seeking an increase in quantum.
We are favored with the testimony of two experts relative to the details of the accident in question. Mr. Alvin Doyle, Jr., an expert accident analyst, of Baton Rouge, Louisiana, testified on behalf of petitioner and its insurer, the Liberty Mutual Insurance Company. He testified that he examined the scene of the accident on November 4, 1958, and secured the details of the accident from the investigating officers. He ran speed and braking tests at the scene of the accident, and testified that the minimum speed a vehicle would have had to be traveling to come to a complete stop within 22 feet skid marks, was 27 miles per hour. Mr. Doyle testified that at a speed of 30 miles per hour the normal person would take 33 feet of reaction time, and 27 feet of actual stopping distance, making a total of 60 feet. This is based upon the normal reaction time of three-quarter second, which is the interval between the time at which the person notices the emergency and the application of the brakes. Considering the 22 feet of skid marks prior to the impact, together with the force of the impact and the 22 feet of skid or slide marks subsequent thereto, Mr. Doyle estimated that, at a bare minimum, defendant Nolan was traveling 42½ miles per hour at the time he applied his brakes. He further concluded that, at the moment of the impact, the Nolan vehicle was traveling 33 miles per hour. He found that the Nolan *4 car was approximately 69 feet away from the point of the impact when he first noticed the impending emergency.
Dr. Lloyd W. Morris, a Professor of Physics of Louisiana State University, testified on behalf of the defendants. He stated that he tested the braking distances in the vicinity of the accident at three different speeds, 30, 35 and 40 miles per hour. However, upon checking his speedometer, he found that there were certain inaccuracies in its readings, and that the actual speeds at which these tests were made were 28, 32, and 37 miles per hour. Dr. Morris further indicated a discrepancy in his tests inasmuch as the braking reaction on his left rear wheel was a little tardy. Correcting for this tardiness, his vehicle left 30 feet of skid marks at 28 miles per hour, 44 feet of skid marks at 34 miles per hour. Dr. Morris testified that with all four brakes locked a vehicle proceeding at 40 miles per hour on the street in question would leave skid marks at 49 feet.
The Lower Court, based upon the expert testimony of Mr. Doyle, concluded that a period of three seconds elapsed between the time that the Regan automobile started from its stopped position beside the stop sign until it reached the point of impact. Under Mr. Doyle's conclusions that the Nolan vehicle was traveling 42½ miles per hour, this would place the Nolan vehicle 170 feet from the point of impact at the time the Regan vehicle left its stopped position. Now assuming that Nolan was only traveling 30 miles per hour, at which speed he would cover 44 feet per second, during the start of this three second period he would have been somewhat less than 132 feet from the point of impact, because, according to Mr. Doyle's sketch, which has been filed into evidence, the actual braking time of the Nolan vehicle consumed .65 seconds, and covered 22 feet, and during the other 2.35 seconds, Nolan traveling at 30 miles per hour, or 44 feet per second, would cover a distance of 103.4 feet, which, when added to the 22 feet of braking time, would indicate that Nolan was at a distance of 125.4 feet from the point of impact when Regan commenced to cross the intersection. Even if this were so, and still assuming a 30 mile per hour speed by Nolan, there would have been ample opportunity for the defendant Nolan to bring his vehicle to a complete stop within this three second interval, as Mr. Doyle testified that the total stopping distance at 30 miles per hour would be 60 feet, and Dr. Morris testified that at 28 miles per hour, a car would skid 30 feet, and adding thereto 33 more feet of reaction time computed at three quarters of a second, would bring the total stopping distance, under Dr. Morris' testimony, to approximately 63 feet. We, therefore, conclude that the Nolan vehicle was proceeding at a rate of speed greatly in excess of 30 miles per hour, and it seems apparent that he was going a minimum of 42½ miles per hour, which speed was determined by the exhaustive research of Mr. Doyle.
Although the Lower Court held that defendant Regan did stop in obedience to the stop sign prior to entering the intersection, it held him guilty of concurrent negligence in failing to keep a proper lookout, and in his failure to see and heed what he could have seen. His testimony as well as that of petitioner is conclusive to the effect that Regan did stop prior to entering the intersection. Regan testified that he looked in the direction from which Nolan was approaching and saw the Nolan vehicle some 320 feet away, at which time Nolan was crossing the railroad tracks. Believing that he had ample time in which to clear the intersection, he proceeded on his journey. Considering the expert testimony which we have before us, as well as the uncontradicted testimony of defendant Regan, it appears to us that he acted reasonably in believing that he had opportunity to clear the intersection. The evidence discloses that, at the moment, Regan was reasonable in concluding that he had ample time to safely clear the intersection. Mr. Regan, of course, had a right to conclude that the Nolan vehicle was being driven within the *5 speed limit of 30 miles per hour, see Wilson v. Williams, La.App., 82 So.2d 71, and we feel that he was only exercising his rights in assuming that Mr. Nolan was obeying the law. Had Mr. Nolan been traveling within the speed law, the physical facts indicate that this accident would not have happened.
We, therefore, feel that the Lower Court erred in holding defendant Regan concurrently negligent herein, and it is our opinion that the record reflects that the sole and proximate cause of this collision was the excessive speed of the Nolan vehicle. The judgment of the Lower Court will be corrected accordingly.
As a result of the collision, petitioner was thrown from the Regan car and suffered injuries to his left knee, left shoulder, left chest, elbows, hands, and numerous abrasions to other portions of his body. His most severe injury was the commuted fracture of the left patella which required surgery resulting in the removal of the upper one-third thereof and the placing of the left leg in a long leg cast. He was hospitalized for a period of fifteen days after which he was permitted to return to his home. During the period of hospitalization, petitioner was under constant sedation. The cast extended from the tip of his toes to his groin. The cast was removed on July 10th, 1958, a period of approximately one and one-half months subsequent to the accident, and a posterior splint, together with ace bandages were then applied. The medical testimony discloses that petitioner has a twenty per cent permanent disability of his left leg.
Prior to the accident, petitioner had developed thrombophlebitis in his left leg for which he was under the care of a doctor. The doctor testified that he had progressed nicely up to the time of the accident, however, the accident had aggravated the condition.
The Lower Court awarded the sum of $12,500 for pain and suffering, as well as permanent disability to petitioner. We have been cited cases both by petitioner and defendants seeking an increase and decrease in this award. Although we have read all cases cited, we have found none directly in point, and those cited by petitioner appeared to be of more serious injuries than those sustained by petitioner, while those cited by defendants tend to be of a less serious nature. Of course, it has often been stated that in awarding damages for physical injuries, each case must be determined by its own particular facts and we find no error in the award granted by the Lower Court. Petitioner was a man of some 52 years at the time of the accident. The medical testimony reflects that his injuries were very painful and he suffered a great deal. The award by the Lower Court of $12,500 is neither excessive nor inadequate under the circumstances presented. As to the award for loss of wages, the Lower Court was favored with the testimony of Forrest G. Ray, an actuary expert. The records reflect that prior to the accident, petitioner was a salesman traveling the State of Louisiana, as well as the southern portion of Mississippi and Alabama. He was employed at a salary of $500 per month. Shortly prior to the accident, he and his employer had entered into an agreement effective January 1, 1959 under which petitioner's earnings would be increased. He was also offered other employment which would result in increased earnings, however, at the time of the accident, his monthly earnings were $500. The other agreement with his then employer, and the offer of others, were correctly held by the Lower Court to be in the realm of pure speculation. Approximately three months after the accident petitioner went to work with a different employer at a salary of $400 per month. He was unable to return to his prior employment because of the travel requirements. He continued in this work until shortly prior to the trial of this matter when he resigned because he was apparently no longer able to do this work, which required short trips and some walking *6 and standing. At the time of the trial, however, he contemplated work with another concern on a commission basis of some $50 to $100 per week. The Lower Court held that as a result of the accident, petitioner has suffered loss of wages at the rate of $100 per month. Mr. Ray, the expert, testified that a man of petitioner's age, i.e. 51 years, nine months, at the time of the accident has a work life expectancy of 12.03 years. Computed on the basis of $100 per month, would result in a loss of $14,400. Discounted at a figure of 2½% would give such loss a present day value of $12,000. The defendants have raised issue with the discount rate allowed by the Lower Court, inasmuch as safe investments may be made at the present time at a minimum of 5 to 6%. This same amount, according to testimony of Mr. Ray, discounted at 5% would equal a present day value of $10,500, and we believe that this reduction should be made in the award of the Lower Court as their 2½% discount seems low to us. The award for loss of wages will therefore be reduced to the sum of $10,500.
The sum of $1,011.44 awarded by the Lower Court for medical expenses has been stipulated by the attorneys for all parties. The total award, therefore, will be reduced to the sum of $24,011.44.
For the reasons hereinabove assigned, the judgment of the Lower Court will be amended so as to dismiss this action insofar as defendants, Dominic A. Regan and his insurer, Liberty Mutual Insurance Company, are concerned, and will be amended so as to reduce the award granted petitioner, Douglas P. Stevens, to the sum of $24,011.44, it being understood that the primary limits of defendant, Royal Indemnity Company, is in the sum of $10,000, and the secondary limit of American Automobile Insurance Company is in the sum of $25,000, and, so amended, the judgment of the Lower Court will be affirmed.
Judgment amended and affirmed.

On Rehearing
LANDRY, Judge.
In our original decree we held defendant, Eugene A. Nolan, to be solely at fault and reversed the judgment of the trial court condemning Dominic A. Regan and Liberty Mutual Insurance Co., in solido, with the remaining defendants herein. Defendants, Nolan, Royal Indemnity Co. and American Automobile Insurance Co., applied for rehearings on the ground we erred in holding Nolan guilty of negligence consisting of excessive speed. More specifically, said applicants for rehearing maintain the record is devoid of evidence of excessive speed on the part of Nolan and that the testimony of the expert witness, Doyle, on which this court principally relied in finding Nolan guilty of negligence, is predicated upon two false premises and assumptions, namely: (1) In timing vehicles crossing the intersection Doyle timed only vehicles stopped within two or three feet of the corner whereas the evidence shows Regan stopped at the stop sign located on Sixteenth Street approximately 12 feet from the intersection with Convention Street and (2) Doyle's estimation of Nolan's speed at 42½ miles per hour was predicated among other things on skid marks assumed to be 22 feet in length whereas the evidence shows the skid marks were overall skid marks of 22 feet from which must be deducted the length of the wheel base of the automobile which is 10 feet and in reality, therefore, said skid marks were only 12 feet in length. In this latter connection it is further contended Doyle's estimate made no allowance for differences in the weight of vehicles, or the condition of tires, brakes or other variable factors.
Plaintiff Stevens also applied for a rehearing praying that the judgment rendered against defendant Nolan and his insurers be increased in the sum of $1,500 in recompense of three months loss of full wages in the amount of $500 per month during *7 June, July and August of 1958, which item of damages was inadvertently omitted in the judgment handed down in this court and that, except as thus amended, our original judgment be affirmed.
Based upon the foregoing applications for rehearing, on January 30, 1961, this court granted rehearings as follows:
"Rehearing granted on behalf of Eugene Nolan, Royal Indemnity Co., American Automobile Insurance Co. and Douglas P. Stevens."
In conformity with the foregoing order, the entire matter was reargued before this court on May 8, 1961, on which date learned counsel for defendants, Regan and Liberty Mutual Insurance Co., moved the case against said defendants be dismissed because of plaintiff's failure to apply for a rehearing on that portion of the judgment of this court rejecting plaintiff's claim against said Regan and his said insurer.
The motion thus presented by counsel on behalf of defendant, Liberty Mutual Insurance Co., raises a procedural question which must be disposed of prior to our considering the merits of this matter on rehearing.
It is the contention of learned counsel for defendants, Regan and Liberty Mutual Insurance Co., that our law is settled to the effect one codefendant has no legal right either by appeal or application for rehearing, to procedurally request an appellate court to cast a codefendant against whom plaintiff has sought no relief. In support of this contention, counsel cites Waggoner v. All-State Insurance Co., La.App., 128 So.2d 214, which we deem to be not in point considering that in the Waggoner case, supra, the issue herein sought to be raised by counsel on application for rehearing was therein presented on appeal.
We recognize that Robertson v. Palmer, La.App., 74 So.2d 408, 411, which was decided pursuant to the provisions of Louisiana Code of Practice Article 912 (since superceded by Louisiana Code of Civil Procedure Article 2166) holds, in conformity with prior jurisprudence, that an application for rehearing stating merely that the original opinion was "erroneous and contrary to the law and the evidence", is subject to dismissal because such an application for rehearing does not state substantially the reasons upon which appellant bases his conclusions of error.
In passing upon the applications for rehearing filed in the instant case, it will be recalled we had before us for consideration the applications of defendants, Nolan, Royal Indemnity Co. and American Automobile Insurance Co., requesting their release from liability coupled with the alternative plea that defendant Regan and his insurer, Liberty Mutual Insurance Co., be cast in solido herein. We also had under consideration the application of plaintiff for an increase in the quantum awarded by this court. It will also be recalled plaintiff was a guest passenger in the automobile driven by defendant Regan under which circumstances he was unquestionably entitled to recovery against either or both drivers and their respective insurers considering he had initially instituted suit seeking judgment against all said defendants in solido. In granting the rehearings requested, we did so without qualification, limitation or restriction. Realizing that we may have committed error in condemning Nolan and exonerating Regan, it was our intention, in granting the requested rehearings to bring the entire matter again before us for further consideration. It was our purpose and aim to reexamine the entire case on the question of liability and having granted the requested rehearing, we purposely did not limit, restrict or confine the rehearing to any particular phase of the case. Under such circumstances we were at liberty to reexamine the claim against defendant Regan and his insurer, Liberty Mutual Insurance Co. under authority of Cox v. Shreveport Packing Co., 212 La. 325, 31 So.2d 815.
Gullett Gin Co. v. Varnado Gin Co., 10 La.App. 158, 120 So. 240, cited by counsel *8 for Regan and Liberty Mutual Insurance Co., is likewise inapplicable for the reason the rehearing therein granted was limited to the request contained in the petition for rehearing. We reiterate that in the case at bar, we expressly granted unlimited rehearing as it was our intention, aim, desire and purpose to bring the entire matter again before us for reappraisal.
Our reexamination of this matter convinces us there is merit in the contention we erred in exonerating Regan and attributing the accident solely to excess speed on the part of Nolan who was proceeding on the right of way street. We are further convinced we additionally erred in holding Nolan guilty of negligence constituting a proximate cause of this accident. Upon further reflection we are constrained to hold the sole proximate cause of the accident was the negligence of defendant Regan as will hereinafter be shown.
Reconsideration of Regan's testimony discloses it to be vague and conflicting. He first testified he stopped his vehicle approximately two or three feet North of the intersection before proceeding to cross. Subsequently he stated he stopped at the stop sign which the evidence shows to be 10 or 12 feet from the intersection and on yet another occasion that he stopped at a point near the stop sign from which he could see the sign from the driver's seat of his automobile at an angle of 45 degrees. Either of these two last positions would place his vehicle more than two or three feet from the corner. Of vastly more importance, however, is the inconsistency in his testimony respecting his observation of the position and movement of the Nolan automobile immediately preceding the accident. In this regard, on direct examination, he testified he stopped before entering the intersection, observed the Nolan vehicle crossing the railroad track some 320 feet distant, kept Nolan's automobile constantly in view and was looking at the Nolan vehicle as he started into the intersection. On this occasion, he further stated he was so far into the intersection that Nolan's car was out of his sight at the moment of impact. See Tr. Pages 270-274.
On cross examination, however, Regan admitted the verity of a prior written declaration dated June 2, 1958, wherein he related he stopped at the intersection, observed Nolan crossing the railroad and, believing he had ample time to negotiate the intersection, started to cross. He further acknowledged he was not again aware of the presence of the Nolan vehicle until he heard the screech of its brakes and upon looking up saw Nolan's automobile about 40 or 50 feet away and, realizing an accident would occur unless he got out of the way, accelerated the speed of his automobile in a futile attempt to avoid the collision. See Tr. Pages 413-415.
Under either version of his testimony, Regan's evidence places Nolan's vehicle approximately 320 feet away at the time Regan started from a dead stop and proceeded into the intersection. At this time, according to his own testimony, Regan felt there was nothing unusual about the speed at which Nolan was approaching and although Regan could not estimate the speed of Nolan's vehicle, his testimony leaves the clear and unmistakable inference he felt that Nolan's speed was such that he had ample opportunity to negotiate the intersection. Obviously, however, Regan was mistaken in either one of two respects. He either underestimated the speed of Nolan's vehicle or its proximity to the intersection at the time he started to cross. Assuming, as testified by Regan, Nolan was crossing the railroad track when Regan proceeded forward, it is certain beyond doubt that at the moment Nolan was then at least 320 feet and perhaps as much as 360 feet from the point of impact inasmuch as the preponderance of the evidence in the record indicates the railway tracks were situated at least 320 feet from the intersection and there is some evidence indicating it to be as much as 360 feet distant therefrom. Giving Regan the benefit of the doubt on this score and placing the Nolan vehicle *9 320 feet away when Regan moved ahead within the three seconds during which Regan proceeded forward to the point of impact, Nolan would have had to be traveling at the rate of 107 feet per second or 73 miles per hour. Assuming Nolan came to a complete stop at the railway track as he testified at one point, to reach an average speed of 73 miles per hour for the necessary three second interval, he must of necessity have accelerated to a maximum speed considerably in excess of 73 miles per hour required to negotiate the distance in a three second interval. Assuming further that Nolan did not stop but "gave it a good hesitation" as he testified in another part of his testimony, it is highly improbable he could have achieved an average speed of 73 miles per hour within such a short distance. Moreover, such a conclusion is absolutely contradictory to all of the evidence of record in this case. There is not one shred, scintilla or iota of evidence in the record of this case to even remotely suggest or infer such excessive speed on Nolan's part. On the contrary, except for the expert testimony of Doyle, all of the evidence reflects that Nolan's speed was not excessive. On this score, it will be recalled the clear inference from Regan's testimony is that Regan was not alerted or alarmed by the speed of the Nolan vehicle or apprehensive of an accident when he first proceeded into the intersection. In this regard, this testimony is corroborated by Officers Tate and Bergeron who investigated the accident and who testified their investigation thereof disclosed no evidence of excessive speed on the part of either motorist.
At this juncture we deem it advisable to state we accept as reasonably accurate the results of Doyle's time checks from which he concluded the average driver starting from a complete stop 2 or 3 feet from the corner could proceed to the point of impact in a matter of 3 seconds. The record shows that on two separate occasions he visited the scene of the accident, stationed himself at a point from which he could follow the movement of vehicles approaching the intersection from the north and using a stop watch timed only vehicles which stopped within 2 or 3 feet of the corner. In this manner he timed approximately 30 vehicles and found the average driver negotiated the distance in approximately 3 seconds. The results thus obtained appear to be based on sound reasoning and procedure.
Upon further reflection, however, we are convinced we attached too much emphasis, importance and weight to the testimony of the witness Doyle as regards the speed at which Nolan was proceeding. Doyle's testimony in this respect is in direct contradiction of all the eyewitness testimony in the record. Although Regan contradicted himself on the issue of Nolan's speed the substance of his testimony is that Nolan was not speeding and he, Regan, thought it was safe for him to cross the intersection. Stevens' testimony is simply to the effect he did not observe the Nolan automobile and had no knowledge of its speed. The disinterested witnesses, Officers Tate and Bergeron, both testified they observed no evidence of excessive speed on the part of either Nolan or Regan. Nolan's testimony is that he was driving at a safe and reasonable speed. Doyle's testimony to the contrary is based upon what we now realize and recognize to be certain incorrect assumptions and, in addition, ignores certain variable factors which we believe affect the accuracy of his conclusion. Doyle concedes he conducted only one stopping distance test using his own 1958 Model Chevrolet automobile equipped with tires which had been driven approximately 6,000 miles. The automobile which defendant Nolan was driving was a 1956 Model Oldsmobile; the condition of the tires thereon is not in evidence. Doyle explained that the condition of the tires and differences in weights of automobiles although having some effect upon the outcome of such tests, was so negligible as to be unworthy of consideration. He was also of the opinion that whether an automobile had power brakes or ordinary brakes, *10 as did his 1958 Chevrolet, would have very little effect upon the outcome of the test. His testimony further shows he calculated Nolan's speed at 42½ miles per hour predicated on the assumption the vehicle skidded 22 feet prior and 22 feet subsequent to the point of impact. Said assumption is clearly erroneous in that the testimony of Officer Tate shows the 22 feet of skid marks referred to in the police report were overall skid marks which, after deducting the wheel base of Nolan's vehicle, in actuality represents skidding of 12 feet instead of 22 feet. The record does not show either the condition of the tires or the kind of brakes on the Oldsmobile Nolan was driving. Although the record is clear the test automobile employed by Doyle was in good mechanical condition, there is nothing to indicate the condition of the Oldsmobile Nolan was driving on the date of the accident. Doyle further admits he conducted only one stop test at a rate of 30 miles per hour because in most cases 30 miles per hour is the maximum legal speed limit and also because such tests become progressively more dangerous at higher speeds. Although he contends that weight and condition of tires have little effect upon the accuracy of such a test, he concedes that they are variable factors which could to some extent affect the outcome of such experiments.
Recent jurisprudence tends to minimize the weight to be accorded so-called expert tests and experiments predicated upon assumptions not necessarily proven or upon variable factors which are not established with reasonable certainty and precision in the particular case involved. Thus in Charles v. Southern Farm Bureau Casualty Insurance Co., La.App., 114 So.2d 48, 53, we find the following:
"`In these computations Mr. Bruce relies heavily on skid marks left on the pavement as portrayed on the engineer's plat. He assumes that they were unbroken as shown on the plats.'
"`Mr. Bruce likewise assumes that cars involved in a collision behave completely in accordance with the laws of physics as developed under laboratory conditions. This assumption is difficult to follow. * * *
"`These matters were called to Mr. Bruce's attention. He simply stated that these variables would not materially change his conclusions.'"
In Brown v. Benjamin, La.App., 120 So. 2d 325, 330, we note:
"* * * We have not reached the point where, under such circumstances, we feel it is incumbent upon us to regard opinioned evidence based upon photographic exhibits as carrying the same persuasive degree of weight as is accorded to a thorough and painstaking on-the-spot investigation made by trained and experienced individuals immediately following the occurrence of the accident."
We acknowledge our error in basing our finding of negligence on the part of Nolan solely upon such so-called expert testimony. We take this opportunity to reiterate the pronouncements contained in Guarisco v. Swindle et al., La.App., 132 So.2d 635, and cases therein cited, to the effect a motorist on a superior street has the right to assume another motorist approaching an intersection on a less favored street will observe the law, yield the right of way and permit the superior motorist to traverse the intersection without impeding his path of travel.
Having considered the foregoing principle as well as the equally well settled corollary thereof to the effect that when the superior motorist realizes in time that the inferior traffic will not yield, he is guilty of negligence if he does not take steps to avoid the collision. We conclude the accident in the case at bar resulted solely from the negligence of defendant *11 Regan in either failing to observe the approach of the Nolan vehicle or if aware thereof, proceeding into the intersection at a time when Nolan was so near it was unwise, unsafe and dangerous for Regan to attempt to cross. We believe the accident occurred substantially as related by Regan in the statement given June 2, 1958, and reaffirmed upon his cross-examination during trial wherein he stated that after looking toward the track he did not look again until his attention was attracted to Nolan's vehicle by the noise of the latter's brakes. At this time Nolan (according to Regan) was only 40 to 50 feet distant and Regan then realizing the danger accelerated his vehicle in an attempt to avoid the impending collision.
We further believe that upon detecting Regan proceeding into the intersection Nolan immediately applied his brakes and did everything possible to avoid the accident but could not do so.
The original opinion does not so state but the record shows that Nolan passed a car that was stopped at the railroad in obedience to the flashing signal that indicated the approach of a train. It may well be that Regan looked to his right after Nolan had passed this stationary vehicle and for some unknown reason did not see Nolan at all but instead saw the stationary auto Nolan had passed and believed it to be the vehicle nearest the intersection.
We further find the facts in the instant case remarkably similar to those in Dennison v. Southwestern Fire & Casualty Co., La.App., 124 So.2d 421, recently decided by this court wherein, under circumstances closely akin to the case at bar, the motorist on the superior thoroughfare was exonerated from liability.
Plaintiff is clearly entitled to recover the sum of $1,500 representing three months loss of wages in the sum of $500 per month which item of damages was inadvertently overlooked in our original decree.
On appeal we awarded plaintiff damages in the sum of $24,011.44 consisting of the following items: $12,500 for personal injuries, pain and suffering; $10,500 for loss of future earnings and $1,011.44 in special damages.
In computing the award for loss of future earnings we initially employed substantially the same formula evolved in Duree v. State of Louisiana et al, La.App., 96 So.2d 854, Stephens v. Natchitoches Parish School Board, La.App., 110 So.2d 156, Day v. National-U. S. Radiator Corporation et al., La.App., 117 So.2d 104 and McFarland v. Illinois Central Railway Co., La.App., 122 So.2d 845, which cases involved, inter alia, damages due surviving widows for loss of support resulting from the deaths of their respective husbands. With the view of establishing some measure of uniformity in such awards, the cited cases developed a rule or formula in pursuance of which gross prospective earnings were ascertained by multiplying present annual earnings by years of life expectancy and discounting the sum thus obtained at an arbitrary rate. Acknowledging that no two cases are entirely alike and that there is some degree of speculation in all awards of this nature, we nevertheless believed utilization of the formula, while not necessarily controlling in each instance, did afford some measure of uniformity and at least a guide by which the value of such awards might be approximately appraised by litigants and members of the bar. We further felt the rule would also tend to promote consistency among the several courts of appeal. However, the criteria thus established by the intermediate appellate courts has been expressly reprobated and disapproved by the Supreme Court upon writs granted in McFarland v. Illinois Central Railway Co., 241 La. 15, 127 So.2d 183, 187, in which the Supreme Court materially reduced an award made by this court and in so doing used the following language:
"Nevertheless, we are unable to give approval to the increase in the award *12 to plaintiff individually which was ordered by the Court of Appeal. That increase appears to have resulted primarily from the application of a mathematical formula developed in three decisions of intermediate appellate courts, namely Duree v. State of Louisiana et al., La.App. 96 So.2d 854; Stephens v. Natchitoches Parish School Board, supra, and Day v. National-U. S. Radiator Corporation et al., La. App. 117 So.2d 104. But this court on several occasions has expressed disapproval respecting the use of such a formula in awarding damages. Thus, in Dobyns v. Yazoo and Mississippi Valley Railroad Company, 119 La. 72, 43 So. 934, 937 we said that `* * * the question of the amount that should be allowed is impossible of determination upon any scientific basis. The most that the courts can do in such case is to exercise a sound judicial discretion and award such amount as, all the circumstances considered, may seem just to both litigants and not unduly oppressive to either. * * *' Italics ours).
"Later, we observed in Jones v. Kansas City Southern Railway Company, 143 La. 307, 78 So. 568, 570 (on the original hearing) that `* * * plaintiff is entitled to recover compensation. The amount of that compensation, due regard being had to the purposes of the law, cannot be fixed with any mathematical certainty, and it is left more or less to the discretion of the courts.

"`We are most earnestly asked to establish some fixed rule by which it might be gauged, but that function being more properly legislative than judicial, we are unwilling to assume it, however desirable and beneficial such a rule might be.' (Italics ours.) (On a rehearing, and apparently for the first time, it was pointed out that the Jones action was controlled by the Federal Employers' Liability Act, 45 U.S. C.A. § 51 et seq., under the provisions of which the United States Supreme Court had set out a definite formula which we were required to accept.)
"And in the more recent case of Brown v. S. A. Bourg and Sons, supra, we stated: `The monetary damages resulting from loss of support cannot be calculated with mathematical exactitude. They are speculative in nature and as in the case of damages for loss of love and companionship, mental anguish and other damages of that character, much discretion must be left to the judge or jury.' (This language is in keeping with a provision contained in Revised Civil Code Article 1934 reciting that `In the assessment of damages * * * in cases of offenses * * * much discretion must be left to the judge or jury * * *.')"
We interpret the foregoing language as a clear expression to the effect the courts of this state are no longer to indulge in the application of the formula evolved in the cases cited hereinabove, or any variation thereof, in computing loss of support due a wife for the death of her husband. As we understand the language of the Supreme Court in the McFarland case, supra, it holds that each case must be decided in the light of its own facts and circumstances without reference or resort to any such formula. We further understand the clear import of the Supreme Court's pronouncements in the McFarland case to be that an award made upon the basis of such a formula will be considered excessive and subject to reduction considering our award therein, predicated upon such formula, was substantially reduced. In our judgment, it follows that, if such a formula may not be employed in fixing an award for loss of support due a widow, it may not be utilized to determine an award for loss of future earnings due an injured plaintiff. We readily concede, therefore, in view of the recent Supreme Court decision *13 in McFarland v. Illinois Central Railway Company, supra, our error in using said formula as the basis of the award made plaintiff herein for loss of future earnings.
Considering the facts and circumstances of this case as set forth in our original decree, we conclude an award of $9,000 will adequately compensate plaintiff for all future earnings which will be lost as a result of his injuries.
Plaintiff, therefore, is entitled to judgment in the aggregate of $24,011.44 itemized as follows: Physical injuries, pain and suffering, $12,500; loss of three months wages at $500.00 per month or the sum of $1,500; diminution or loss of future earnings, $9,000; and special damages in the amount of $1,011.44.
For the reasons hereinabove set forth, it is therefore ordered, adjudged and decreed that the judgment previously rendered herein be and the same is hereby recalled, rescinded and set aside and judgment rendered herein in favor of plaintiff, Douglas P. Stevens, and against defendants Dominic A. Regan and Liberty Mutual Insurance Co., in solido, in the sum of $24,011.44 together with legal interest thereon from date of judicial demand, until paid.
It is further ordered, adjudged and decreed that the judgment of the trial court as well as the original judgment of this court casting defendants, Eugene A. Nolan, Royal Indemnity Co. and American Automobile Insurance Co., is hereby annulled, reversed and set aside and plaintiff's demand against said defendants dismissed with prejudice.
Amended and affirmed.