STOULIG, Judge.
This is an appeal, lodged by the defendant, from a jury verdict of $40,000 awarded to the plaintiff for personal injuries and other related items of damages sustained in an automotive accident. In his original petition, plaintiff sought damages in the sum of $20,400, which he increased, in a supplemental pleading, by an additional amount of $70,000 to cover loss of future earnings.
Briefly stated, the undisputed physical facts are that on September 13, 1967, plaintiff, Albert C. Abadie, was a passenger on a Louisiana Rapid Transit bus, when it was struck in the rear, while in a stopped position, by a school bus owned and operated by the defendant, Earl Lewis, Sr., the assured of the codefendant, Employers Group Insurance Company. The force of the collision caused plaintiff to be suddenly thrust forward and then backward, resulting in the injuries forming the basis of his claim.
Only one of the defendants, Employers Group Insurance Company, was cast in judgment, and it has instituted this appeal maintaining that the quantum of damages *85 awarded by the jury is excessive and should be reduced. Plaintiff answered the appeal seeking to have the judgment increased to $100,000 or alternatively that a new trial be granted.
Liability of the defendant Employers Group Insurance Company is admitted; only quantum is at issue. The question posed by the appeal is, did the jury abuse its discretion in its award of damages?
At the outset it should be noted that the jury’s verdict was in the aggregate sum of $40,000, without the allocation of specific amounts for the various items of damages. From the record, as constituted, the court is unable to ascertain what segments of the plaintiff’s claim were recognized by the jury, nor are we able to consider separately the reasonableness of the award for each particular type of damage. We must assume somewhat speculatively, that all elements of the claim were accepted by the jury and that its award was in full satisfaction of all the damages and losses allegedly occasioned by the accident.
The record reflects that the medical experts testifying on behalf of plaintiff were Dr. Blaise Salatich, orthopedist, and Dr. Joe Hopkins, radiologist. Defendants’ expert was Dr. G. Gernon Brown, Jr., an orthopedic surgeon. All of these witnesses were in agreement that plaintiff did not suffer any fractures and that the osteo-phytes (spurring) are a degenerative phenomenon and not trauma oriented. Though Dr. Salatich adroitly avoided committing himself, both Drs. Hopkins and Brown stated that the cervical spondylosis was a developmental osteoarthritic condition, not attributable to injury. No disc dislocation was involved and, admittedly, the narrowing of spaces between the cervical vertebrae 4-5, 5-6, and 6-7 are not traumatic in origin. The only evidence relating to the lordotic curve confirms it to be both good and normal. Muscle spasm was found only by the plaintiff’s doctors and in the odontoid bone area and the “S” curve on forward flexion.
It is the medical opinion of Drs. Hopkins and Salatich that the injury aggravated plaintiff’s preexisting condition, particularly as it relates to the spurring and the narrowing of intervertebral spaces. Dr. Brown is of the contrary opinion. The resolving of the issue created by this divergence of medical opinion will be determinative of the nature and extent of plaintiff’s injuries.
Mr. Abadie was first examined by his treating physician, Dr. Blaise Salatich, some five days after the accident. His findings consisted of soft tissue tightness and muscle spasms on the back and side of the neck; loss or limitation of cervical motion in all directions; moderate to marked tenderness to pain over left suboccipital area; marked tenderness of mid and left cervical vertebrae; hyperasthesia of skin on left shoulder; a narrowing of spaces between the fourth through seventh cervical vertebrae. All of these are pathological symptoms of a cervical strain. It was his diagnosis that plaintiff had sustained “a severe whiplash or marked whiplash or marked whiplash-type neck injury.”
Indeed this must be characterized as an extremely moderate or conservative diagnosis by Dr. Salatich of Mr. Abadie’s physical condition. Accordingly, the medical treatment rendered was both routine and minimal (consisting exclusively of muscle relaxants, penetrating ointments and analgesics), particularly when considered in the light of the testimony of Dr. Salatich that his patient’s condition was retrograding and he constantly complained of pain. It is also surprising to note that despite his testimony that Mr. Abadie was not responding to treatment and was constantly complaining of pain, the treating physician did not prescribe a cervical collar, traction, or some other recognized form of physical therapy. He advanced no reason for failing to recommend traction or physical therapy; however, he did state that the cervical collar was considered but rejected because in all probability it would cause plaintiff to lose his job. While this *86 is purely a conjectural assumption, the reason advanced is also inconsistent with his prior testimony that plaintiff should change his employment, as a construction electrician, because it aggravated his condition.
Plaintiff’s record of office visits with Dr. Salatich reflects the following: 8 in September, 12 in October, 5 in November, and 4 in December of 1967; only 7 visits during the entire year of 1968, and 8 visits in 1969. The significance of this activity is twofold: First, it indicates an irregular and infrequent schedule of treatments for a person allegedly in constant pain from a gradually deteriorating condition; and secondly, plaintiff testified that pain dictated the occasion of these visits, thus confirming that the onsets were intermittent.
Dr. Salatich stated that he objected to plaintiff’s continued employment as a construction electrician because it involved the use of his head and shoulders, and required him to stoop and climb. Apparently, he concluded these activities placed stress and strain on the injured cervical area; yet he voiced no objection to plaintiff’s performing the duties of a maintenance electrician, which involved the same type of activities and the use of the same members.
Dr. Salatich’s findings that plaintiff’s condition was progressively becoming worse and still required treatment is readily understandable, however, only if it is made referable to the degenerative or developmental phenomenon of spurring and osteoarthritis. In such a case the patient will never revert to complete normalcy because these are deteriorating processes caused by advanced age and not trauma.
As opposed to the foregoing, Dr. Brown in his examination of the plaintiff, conducted on November 25, 1968, a year before the trial of the matter, found no evidence of muscle spasm or soft tissue tightness in the cervical area, no tenderness of the cervical spine, no weaknesses, no atrophy, no motor or sensory differences and no nerve pathology. Plaintiff’s complaint on motion of his neck was one of discomfort and not of pain. This expert testified there was no X-ray, clinical, or other demonstrable evidence of injury to the cervical spine. In his opinion there was nothing to prevent the plaintiff from climbing, stooping, squatting, lifting, and using tools, as far as his neck was concerned. He was unable to deny that the plaintiff was injured or that he was suffering discomfort with his neck.
A careful evaluation of the medical and lay testimony, bearing upon plaintiff’s injury, leads us to conclude that Mr. Aba-die sustained a moderate to severe whiplash injury to his neck, causing, to an indefinite extent, an acceleration and aggravation of his preexisting cervical degenerative condition. This injury produced pain which gradually diminished in intensity and frequency until it retrogressed to the status of intermittent discomfort. Such a conclusion is warranted from several evi-dentiary sources, particularly Dr. Brown’s classification of discomfort based upon plaintiff’s description of his sensation; the fact that plaintiff has continuously worked from the date of injury with no absenteeism except for one or two days, thus confirming that the injury and its attendant pain was not severe enough to be incapacitating; and lastly, plaintiff worked steadily for nine months immediately following the accident at his former occupation as a construction electrician, without voicing any complaint to his employer.
The court is satisfied that the plaintiff had an uneventful and normal recovery from his whiplash injury at least by November 25, 1968, when the examination of his cervical area by Dr. Brown proved to be negative. However, there still persisted the residual of occasional discomfort even through the date of trial some three years later.
Not being favored with an award by the jury for this phase of plaintiff’s claim, and therefore precluded from adjudging its reasonableness, we are of the opinion that *87 the sum of $12,000 reasonably and adequately compensates the plaintiff for his injuries, pain, suffering, inconvenience and residual discomfort. In addition, the plaintiff is entitled to recover the following medical expenses: Dr. Duke, $30; Dr. Hopkins, $30; Dr. Salatich, $355; and drugs, $265, or total special damages of $680.
There remains for our determination the question whether or not the injury caused plaintiff to suffer the loss of wages and impaired his future earning capacity.
Plaintiff maintains that as a result of his injury, and on the advice of his physician, he was required to change the character of his employment from a construction electrician to a maintenance electrician. The differential in pay was $1 per hour and based upon a 40-hour week, for a 50-week year, he suffered a loss of wages, from the time he changed employment to the date of trial, of $3,000. Meanwhile, due to an increase in the hourly wages, the differential per hour increased to $1.78 and he computed his loss on a 40-hour week for his projected work expectancy to age 65, of 21 years, and therefore he will sustain a loss of future earnings in the aggregate of $74,760.
It should be immediately noted that this method of computation used by the plaintiff in ascertaining his loss of future earnings has been proscribed by the Supreme Court in the case of McFarland v. Illinois Central Railroad Company, 241 La. 15, 127 So.2d 183 (1961). And in the case of Stanford v. Bateman Frozen Foods Company, 149 So.2d 753 (La.App.1963), the First Circuit reaffirmed that the application of the mathematical formula based upon work expectancy could not be utilized in determining the loss of future wages. Also Stevens v. Liberty Mutual Insurance Company, 133 So.2d 1 (La.App. 1st Cir. 1961). Recognizing the difficulty of determining with reasonable certainty and probability the loss of future earnings, in the absence of any scientific and mathematical basis for doing so, in the case of Viator v. Gilbert, 253 La. 81, 216 So.2d 821, 822, 823 (1968), the Supreme Court indicated the guidelines to be used in making such a determination :
“Thus it appears that plaintiff is entitled to recover for whatever loss of future earnings he will sustain as a result of the accident. In attempting to arrive at the correct measure of damages for this item, it is essential that we direct attention to plaintiffs physical condition prior to the accident, his work record, the amount of his earnings and the probability or improbability that he would have been able to earn similar amounts for a number of years but for the disability brought about or aggravated by the 1965 accident. Then, too, consideration must be given to the settled jurisprudence of this Court that allowance of monetary damages for loss of future earnings (or support of dependents in case of death) cannot be calculated with mathematical exactitude; that they are speculative in character and the ' * * * most that the courts can do * * * is to exercise a sound judicial discretion and award such amount as, all the circumstances considered, may seem just to both litigants and not unduly oppressive to either.’ * * * ”
See also Courville v. B & B Engineering and Supply Company, 230 So.2d 377 (La.App. 1st Cir. 1969).
Another factor to be considered in awarding damages for loss of wages and future earnings is that it is an action sounding in tort and must be proved with reasonable certainty. Our appellate courts differentiate between a disabling injury within the scope of our compensation statutes and one arising out of tort.
In the matter of Kempff v. B. E. King & Sons, Inc., 222 So.2d 921, 927 (La.App. 4th Cir. 1969), the court observed:
“The basic principle in awarding damages for loss of future wages is that a plaintiff must prove this loss with rea *88 sonable certainty and speculation and conjecture cannot form the basis for this award. * * * We must note that this is not a workman’s compensation situation where the test to be applied is whether or not plaintiff can do work of a reasonable character with that he was doing prior to his injury. Rather this is an action in tort where the plaintiff to be awarded a sum for loss of future wages, must prove that he will actually lose in future by reason of his injury. * * * »
This ruling is a reiteration of the holding in the case of Freeman v. Liberty Mutual Insurance Company, 175 So.2d 659, 664 (La.App. 1st Cir. 1965):
“ * * * Counsel for plaintiff has argued that the evidence clearly establishes that Mr. Freeman will never again be able to hold the job that he was doing at the time of the accident, either with his former employer or any other employer in a similar business. While we recognize that this may be true, we nevertheless also recognize that this is not a workmen’s compensation case where the test to be applied to the plaintiff’s injury is whether or not he is capable of doing work of a reasonable character that he was doing before his injury. This is rather an action in tort and its purpose, once having determined the liability of the defendant, is to compensate the plaintiff for the earnings which he has lost in the past as a result of his injury, and for those earnings, if any, that he will lose in the future by reason of his injury.”
We are aware of the admonition of the Supreme Court that an award of damages, either by a trial judge or a jury is to be accorded great weight and is not to be disturbed unless manifestly an abuse of discretion. In the case of John Miller, individually and on behalf of his minor daughter, Deborah Ann Miller v. Lionel J. Thomas et al., La., 246 So.2d 16 (1971), after citing article 1934(3) of the Louisiana Civil Code and the cases of Gaspard v. LeMaire, 245 La. 239, 158 So.2d 149 (1963); Ballard v. National Indemnity Company of Omaha, Neb., 246 La. 963, 169 So.2d 64 (1964), and Lomenick v. Schoeffler, 250 La. 959, 200 So.2d 127 (1967), the Court stated:
“From these decisions, two principles emerge: (1) To modify the amount of an award for general damages, an appellate court must find that the trial judge or jury has abused the 'much discretion’ accorded by the codal provision; (2) The awards in other cases serve only as an aid in determining whether there has been an abuse of discretion and rivet no steel frame of uniformity.”
It should be emphasized that this reference is applicable to general damages for injuries, etc., as opposed to the special damages of the loss of earnings. Further in attempting to comply with this mandate, we cannot abdicate our appellate function and duty to modify, and even reject, an award which is not sustained by a preponderance of competent available evidence. Here we are not concerned with the reasonableness of the amount of the award for loss of future and past earnings but whether any award for this item of the claim should have been made at all.
Has plaintiff established by a preponderance of evidence that the disability resulting from his injury necessitated a change in the nature of his employment, resulting in a loss of income? We think not. In support of our conclusion we rely upon the inconsistent statements of Dr. Salatich, the opinions of Dr. Brown, plaintiff’s testimony, plaintiff’s work record, and the testimony of his former employer.
Dr. Salatich testified that he insisted upon the plaintiff’s changing the nature of his employment from that of a construction electrician to a maintenance electrician because the former is an “occupational hazard” and “unsafe occupational activity,” requiring stooping and climbing and involving the use of the affected cervical *89 area. The two interesting aspects of this recommendation are that it was not offered until some six months after the occurrence of the injury and, further, that he considered the job of maintenance electrician as acceptable even though its duties and activities were the same as those involved in construction work.
Dr. Brown unequivocally testified that based upon his medical eaxmination, the plaintiff could engage in all the activities of an electrician, including the use of all the necessary tools, insofar as his neck is concerned.
Mr. Abadie in assigning his reason for changing employment did not contend that because of his injury he was unable to perform the duties of a construction electrician, but stated he quit because, “I couldn’t do outside work no more, I could feel it too much.” No other explanation was offered. He does not mention that he could not perform any specific duties or functions of a construction electrician, but merely declared he could not do outside work “no more.” It is our appreciation of the evidence that Mr. Abadie rarely worked outside for any sustained periods of time.
By his own testimony, for a year prior to the accident he worked in the Maison Blanche Building and performed both construction and maintenance electrical work. He testified that a week after he began working in the building its regular maintenance man was discharged and on occasions he performed this type of service for them. Nine months after the accident when offered the regular employment of maintenance electrician in the Maison Blanche Building, he readily accepted.
The court is convinced from this testimony that Mr. Abadie voluntarily accepted this employment at a lesser salary solely in order to remain in the Maison Blanche Building in the familiar surroundings and the congenial atmosphere in which he had been working for the previous 21 months. His election to change employment was voluntary and for considerations other than the disabling effects of his injury.
According to his employer Mr. Abadie had a commendable work record, having been absent only one or two days from the time of the accident to the date of trial. Why plaintiff waited nine months to change his type of employment and then, coincidently, when offered the job of maintenance electrician in the Maison Blanche Building was never satisfactorily explained. Finally, Mr. Robert Pfleuger, plaintiff’s former employer, stated he was satisfied with Abadie’s work after the accident and that he would have continued his employment. He further testified that the plaintiff never complained to him that he was unable to perform his work except to mention on one occasion he could not keep up. Mr. Pfleuger stated that had plaintiff not quit he would have retained him as a foreman and is willing to rehire him now.
From the foregoing it is our opinion that the plaintiff has failed to bear the burden of proof necessary to preponderate in favor of the finding that his change of employment was occasioned by and attributable to the disabling effects or residual incapacity of his injury. Accordingly, his claim for the loss of wages and future earnings must be rejected.
Several circumstances of plaintiff’s claim are most unusual and create some misgivings in the mind of the court. Plaintiff’s present residual disability has no objective basis of pathological or clinical support but rests solely on the subjective complaint of pain; the conservative minimal medical treatment administered; his excellent work record with no loss of time following the injury; and no loss of function of a member or hospitalization was involved. Nor was any cervical appliance, traction, or physical therapy ever prescribed or administered.
The defendant in this action does not have the statutory safeguard of periodic reevaluation of disability, such as is afforded in compensation awards, to mini *90 mize or limit its liability against the unscrupulous, the feigner, or the malingerer. Mr. Abadie could collect his jury award, including approximately $20,000 loss of future earnings for his entire projected work expectancy of 21 years, and resume his former occupation the following day.
For the foregoing reasons, the judgment of the trial court is amended so as to reduce the award of damages in favor of the plaintiff, Albert C. Abadie, and against the defendant Employers Group Insurance Company from $40,000 to $12,680, and as thus amended and in all other respects the same is affirmed. Costs of this appeal are to be borne by the plaintiff-appellee.
Amended and affirmed.